Trevor BURT, Plaintiff,

v.

**NATIONAL REPUBLICAN CLUB OF CAPITOL HILL, et al., Defendants.**

**Civil Action No. 10–1911 (ESH).**

United States District Court, District of Columbia.

Dec. 8, 2011.

Appeal Filed April 3, 2012.

---

118

Jimmy A. Bell, Law Office of Jimmy A. Bell, P.C., Bowie, MD, for Plaintiff.

Jean F. Kuei, Tyree P. Jones, Jr., Reed Smith LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLEN SEGAL HUVELLE, District Judge.

Plaintiff Trevor Burt claims that his employer, the National Republican Club of Capitol Hill (the "Club"), and his supervisor, Stanley Lawson, the Club's General Manager (collectively, "defendants"), discriminated against him based on his race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 2–1401 *et seq.* Burt is African American. He alleges that because of his race defendants did not compensate him fairly when he assumed the duties of Interim Executive Chef at the Club, and did not hire him for the permanent Executive Chef position. Before the Court are defendants' motion for summary judgment, Burt's opposition, and defendants' reply. For the reasons stated below, defendants' motion will be granted.

## LOCAL CIVIL RULE 7(H)

As defendants argue, Burt has failed to comply with Local Civil Rule 7(h), which provides that a motion for summary judg-ment must "be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue" and that any opposition must counter with a statement of disputed facts and substantiating record citations. LCvR 7(h). Here, in accordance with Rule 7(h), defendants have filed a Statement of Undisputed Material Facts. (*See* Defendants' Motion for Summary Judgment, Sept. 23, 2011 [Dkt. No. 17] ("Defs.' Mot.") at 16–21 ("Defendants' Statement of Undisputed Material Facts" or "Defs.' SOF").) Defendants provide a factual account in thirty separately-numbered paragraphs, each supported by "references to the parts of the record relied on to support the statement." LCvR 7(h).

In opposing defendants' motion, Burt was required under Rule 7(h) to provide "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." *Id.* Burt has failed to do this. His memorandum opposing defendants' motion includes sections entitled "Statement of Material Facts in Dispute" and "Statement of Facts," and he has also submitted a separate "Statement of Facts." (*See* Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Hearing Request, Oct. 10, 2011 [Dkt. No. 18] ("Pl.'s Opp'n") at 1–4 ("Statement of Material Facts in Dispute"); Statement of Facts, Oct. 10, 2011 [Dkt. No. 18–3] ("Pl.'s SOF").) Yet, in all of these sections, which overlap considerably, Burt makes no meaningful attempt to dispute—or even respond to—defendants' statement of material facts. The majority of Burt's assertions merely parrot the allegations in his complaint. (*Compare* Pl.'s SOF ¶¶ 1–7

*with* Complaint, Nov. 8, 2010 [Dkt. No. 1] ("Compl.") ¶¶ 12–21.) The remaining paragraphs consist of legal conclusions. (*See, e.g.,* Pl.'s SOF ¶ 8 ("Plaintiff was discriminated against in the making of his employment contract with Defendant.").) All paragraphs are supported only by citation to the entire affidavit of Kim Crawford, the Club's former Assistant Controller and Human Resources Manager, or forty-seven pages of deposition testimony from Linda Mintz, the Club's former Controller. (*See id.* ¶¶ 1–5, 7–10 ("Affidavit of Kim Crawford and Depo. of Lina [sic] Mintz p5–51"); *id.* ¶ 6 ("Affidavit of Kim Crawford").) Burt's assertions "fail[ ] to controvert most of the facts set forth by defendant[s]" and instead "merely repeat[ ] the complaint's allegations and conclusions." *Carter v. Greenspan,* 304 F.Supp.2d 13, 21 (D.D.C.2004). Accordingly, "the court will assume that [Burt] admits those facts presented by defendant[s] in [their] statement of material facts ... which he does not refute." *Id.;* see LCvR 7(h) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 154 (D.C.Cir. 1996) ("[P]ursuant to the remedy afforded by Rule [7(h) ], the district court is to deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's Rule [7(h) ] statement."); *see also S.E.C. v. Banner Fund Int'l,* 211 F.3d 602, 616 (D.C.Cir.2000) (concluding that the district court was "fully justified" in treating the moving party's statement of material facts as admitted where the nonmoving party did not follow Rule 7(h) in opposing the motion for summary judgment and instead "filed a response and an affidavit,

neither of which pointed to specific parts of the record controverting the [moving party's] lengthy statement of undisputed facts" (citing *Jackson,* 101 F.3d at 154)). As such, in summarizing the factual background the Court relies on those facts put forward by defendants which Burt has not contravened.

## FACTUAL BACKGROUND

Burt applied for the position of Banquet Chef at the Club on December 29, 2009. (Defs.' SOF ¶ 1.) After completing an employment application on January 7, 2010, Burt was interviewed by Lawson, AlaaEldin Saleh (the Club's Executive Chef at the time), Mintz, and Israel Canada (the Club's Catering Director). (*Id.* ¶ 2.) Lawson hired Burt as Banquet Chef with a start date of January 25, 2010. (*Id.* ¶ 3.)

Upon Saleh's departure from the Club in March 2010, Lawson hired Robert Vickers as Executive Chef. (*Id.* ¶ 8.) When Vickers left the next month, Lawson appointed Burt to the position of Interim Executive Chef. (*Id.* at ¶ 11); *see* Burt Dep., Ex. 5 (email from Stan Lawson to CHC; Subject: Trevor Burt; April 30, 2010 ("Effective immediately, Trevor has been appointed 'Interim Executive Chef.' ").) According to Burt's deposition testimony, immediately after appointing him Interim Executive Chef, Lawson told Burt that "[he] was going to be the potential candidate for the [Executive Chef] position." (Burt. Dep. at 164.)

Burt's duties as Interim Executive Chef "consisted of supervising, preparing, and producing food in the main kitchen for special events at the Club." (Defs.' SOF ¶ 14.) In addition, Burt retained his duties as Banquet Chef. (*Id.* ¶ 11.) The Club paid Burt an additional $200 per week as compensation for his Interim Executive Chef duties. (*Id.* ¶ 16.)

The Executive Chef, by contrast, "is responsible for the entire culinary operation of the Club," including overseeing the grill (the Club's basement restaurant that serves breakfast, lunch, and dinner), the dining room, and all of the banquets; special events; hiring, training, supervising, disciplining, and terminating other food service employees; supervising food purchasing; working with the General Manager to develop menus; and supervising all kitchen personnel. (*Id.* ¶ 6 (citing Lawson Dep. at 16–19).) It was Burt's understanding that, with his appointment to Interim Executive Chef, he was to assume all of the responsibilities of the Executive Chef position. (Burt Dep. at 164.) Lawson testified, however, that while Burt's responsibilities as Interim Executive Chef were "in theory" all of those assigned to the Executive Chef, in practice, "because [the Club was] somewhat short staffed, [Burt] did not have the time or wherewithal to effectively supervise the grill part of operations." (Lawson Dep. at 21; *see id.* at 21–22 ("[A]ll of the other activities that were going on at the [C]lub just precluded ... Burt from being able to spend any significant time supervising the activities of the grill.").) Besides asserting, without elaboration, that he performed "this [sic] same duties" as prior Executive Chefs when he served as Interim Executive Chef (Pl.'s SOF ¶ 10 [1]), Burt has not responded to defendants' claim that the respective jobs' duties differed significantly. The Court concludes, therefore, that Burt has admitted defendants' assertion that, "[a]lthough Burt's duties as Interim Executive Chef consisted of some of the duties performed by the Executive Chef, he did not spend a significant amount of time super-

vising the grill like previous Executive Chefs." (Defs.' SOF ¶ 15.)

Burt knew that his appointment as Interim Executive Chef was temporary (*id.* ¶ 13 (citing Burt Dep. at 164)), and he continued to express interest in being hired for the permanent Executive Chef position. When he asked Lawson about interviewing for the position about a month after he was appointed Interim Executive Chef, Burt testified that he was told, "[W]e don't need to interview you. You're employed here. Your interview is what you are doing every day." (Burt Dep. at 183; *see id.* at 184.) Burt further testified that Lawson told him, "You're doing a very good job.... [W]e don't need to interview you. You don't need to apply for a job. Your interview is what you do every day on the job." (*Id.* at 183.) By the summer of 2010, at which point Burt knew that the Club was considering a number of candidates for the Executive Chef position (*id.* at 182), Burt testified that he also knew that he was still being considered. (*Id.* at 184.)

In August, at Lawson's suggestion, the Club's House Committee added a taste test component to the hiring process for the Executive Chef position, whereby the candidates would prepare a meal for members of the Committee. (Defs.' SOF ¶ 21.) Lawson testified that he developed the taste test concept "in order to more definitively determine a chef's cooking abilities." (Lawson Dep. at 11.) He acknowledged that prior hiring processes for the Executive Chef position had not included a taste test component (*id.* at 10), but he explained that those processes had seemed incomplete—references had proven insufficient in determining candidates' relative

---

1. This paragraph reads in full: "Plaintiff was denied equal compensation for the intern [sic] Acting Executive Chef Job for doing this [sic] same duties as the persons outside of his protected class that did the same job because of race and discrimination. Affidavit of Kim Crawford and Depo of Lina Mintz p5–51." (Pl.'s SOF ¶ 10.)

cooking abilities—and had produced mixed results. (*Id.* at 11–12.) Although Burt emphasizes that prior Executive Chefs did not undergo a taste test as part of their application for the position, he does not allege any impropriety in the Club's decision to implement the taste test in the hiring process here.

On August 19, 2010, Lawson emailed Burt and requested that Burt assemble the ingredients for the taste test. (*See* Burt Dep., Ex. 6, at 2–3 (email from Stan Lawson to Trevor Burt; Subject: Food items for 8/25 chef tasting; August 19, 2010).) Lawson instructed: "Trevor, there will be 3 (including you) chefs, each cooking for 6 people at the most." (*Id.* at 2.) In his email, Lawson acknowledged that Burt might "feel[ ] a bit weird" preparing the materials for the taste test, but offered that "you are getting a head start by at least knowing the ingredients." (*Id.*) In his deposition, Lawson cited his email of August 19 as evidence that he considered Burt for the Executive Chef position. (Lawson Dep. at 37–38.) He testified that his purpose for emailing Burt, in addition to asking him to gather the ingredients, was "to, once again, alert him to the fact that he was in the final cut, if you will, and was being considered for [the] [E]xecutive [C]hef position." (*Id.* at 38.)

Burt chose not to participate in the taste test. (Defs.' SOF ¶ 25.) While neither party has presented direct testimony from Burt that explains his refusal, Burt does not dispute that he chose not to participate. Defendants assert that "Burt told Lawson that he was not going to participate in the tasting component of the hiring

process because 'he felt that he had been doing the job and cooking in that role for several months and that he, therefore, shouldn't need to be competing with other chefs.' " (Defs.' SOF ¶ 25 (quoting Lawson Dep. at 33).[2]) Lawson testified that he told Burt in response: "[P]lease understand that this is the final test and if you take yourself out of this . . . and refuse to be involved in the tasting then you're taking yourself out of consideration for the position." (Lawson Dep. at 39.)

Only Gilbert Rodriguez, the candidate who was ultimately hired for the Executive Chef position, participated in the taste test. (Defs.' SOF ¶ 27.) Defendants assert that Rodriguez's Hispanic ethnicity was not a factor in his selection, and Burt's race was not a factor in his not being hired. (*Id.* ¶¶ 28, 30 (citing Lawson Dep. at 39–40).) Indeed, Lawson testified that the only reason Burt was not hired as the Executive Chef was his refusal to participate in the taste test component of the hiring process. (*Id.* ¶ 29 (citing Lawson Dep. at 40).)

In November 2010, Burt filed an employment discrimination lawsuit against the Club and Lawson. After the close of discovery, defendants moved for summary judgment.

## STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 335 (D.C.Cir.2011); *see*

---

**2.** Mintz testified that after Lawson asked Burt to participate in the taste test, Burt's "answer was, no, he did not choose to participate." (Mintz Dep. at 32.) When asked why Burt chose not to participate, Mintz relayed her opinion that it was because he "did not receive an interview." (*Id.; see* Pl.'s Opp'n at

23 (Burt "was not even given the opportunity for an interview eventhough [sic] he was the acting Chef.").) For his part, Lawson testified that Burt "never expressed . . . an opinion about whether [the taste test] was fair or not." (Lawson Dep. at 33.)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" and precludes summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

When considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Still, when the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It may not rely on "mere allegations or denials," but rather "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks and citation omitted). "[W]holly conclusory statements for which no supporting evidence is offered" will not suffice. *Carter*, 304 F.Supp.2d at 21 (citing *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C.Cir.1999)). A moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## ANALYSIS

Burt raises two claims: 1) that defendants discriminated against him based on his race in denying him fair compensation during his tenure as Interim Executive Chef; and 2) that defendants discriminated against him based on his race by denying him the permanent Executive Chef position.

 These claims are based on the Civil Rights of 1866, 42 U.S.C. § 1981, and the DCHRA, D.C.Code § 2–1401 *et seq.* In addressing employment discrimination claims under these laws, courts look to the jurisprudence surrounding Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq. Sullivan v. Catholic Univ. of Am.*, 387 F.Supp.2d 11, 13 (D.D.C.2005) (citing *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C.Cir.1999) (DCHRA)); (*Carney v. Am. Univ.*, 151 F.3d 1090, 1092–93 (D.C.Cir.1998) (42 U.S.C. § 1981)). Under *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C.Cir. 2008), Title VII "establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Id.* at 493. The D.C. Circuit's "standard for an adverse employment action is well-established: '[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Czekalski v. LaHood*, 589 F.3d 449, 454 (D.C.Cir.2009) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C.Cir.2002)) (alteration in the original); *see also Russell v. Principi*, 257 F.3d 815, 818 (D.C.Cir.2001) ("The Supreme Court has described the concept of a 'tangible employment action' as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits.'" (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998))).

■ Once an employee has shown that he suffered an adverse employment action, the burden shifts to the employer to come forward with a "legitimate, non-discriminatory reason" for the challenged employment action. *Brady,* 520 F.3d at 494. If the employer then moves for summary judgment, the district court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not that the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* If the employee has not met his burden, the employer's motion for summary judgment is properly granted. *Id.* at 497.

## I. INTERIM EXECUTIVE CHEF COMPENSATION CLAIM

■ Burt claims that the additional compensation he received for his Interim Executive Chef duties was significantly less than the salary paid to prior Executive Chefs, who, according to Burt, were white. (*See* Compl. ¶ 18 (alleging that Burt received only $5,600 in additional compensation for his four month tenure as Interim Executive Chef, whereas over the same period prior Executive Chefs would have earned $37,000); *id.* ¶¶ 29–30, 35–36.) Defendants counter that Burt's compensation comparison is inapposite, as his duties as Interim Executive Chef were not the same as those performed by prior Executive Chefs. (*See* Defs.' Mot. at 10.) Specifically, defendants allege that Burt "did not spend a significant amount of time supervising the grill like previous Executive Chefs … had done prior to their departure." (Defs.' SOF ¶ 15 (emphasis deleted); *see* Lawson Dep. at 20–22.) Lawson also testified to the significance of grill supervision as a part of the Executive Chef position: "[T]he grill is the key creator of member opinions about the quality of the food in the [C]lub. And so it has an inordinate importance in the overall scope of the operation despite the fact that … its sales are not that significant" in relation to "the [C]lub's revenues." (*Id.* at 24.) Defendants maintain, therefore, that the difference between Burt's compensation as Interim Executive Chef and that paid to prior Executive Chefs is explained by the fact that Burt did not supervise the grill, whereas prior Executive Chefs did.

Burt has not made any effort to rebut defendants' asserted nondiscriminatory reason. Aside from repetitions of the complaint's allegations and unspecified references to lengthy excerpts of deposition testimony, the only response Burt offers is: "Defendants do not even make a legitimate argument as to why [Burt] did the same duties as the white chef but was paid a fraction of his salary." (Pl.'s Opp'n at 27.) Burt is incorrect: defendants submitted evidence to show that Burt did not, in fact, perform the same duties as prior Executive Chefs (*see* Defs.' SOF ¶ 15; Lawson Dep. at 20–22), and Burt has not put forward any evidence to suggest that defendants' asserted reason is pretextual. Since Burt failed to contest this fact, he cannot assert, without substantiation, that the duties were the same. The Court therefore concludes that Burt "has failed to put forward sufficient evidence for a reasonable jury to find that [defendants'] legitimate, non-discriminatory reason was not the actual reason and that [defendants] intentionally discriminated against him on the basis of race." *Brady,* 520 F.3d at 497.

## II. EXECUTIVE CHEF CLAIM

Burt alleges that "he applied and was qualified for the Executive Chef position"

and that, "despite his qualifications, he was rejected" in favor of a candidate "outside of [his] protected class." (Compl. ¶ 34; *see id.* ¶¶ 13–14, 16.) In the alternative, Burt argues that defendants never gave meaningful consideration to his candidacy for the position, as evidenced by the facts that he never received a copy of the job description and that he was not offered a formal interview. (*Id.* ¶ 13; *see* Pl.'s Opp'n at 23.)

Defendants, however, have put forward evidence, which Burt does not rebut, to show that Burt was indeed considered for the position. Of primary importance is Burt's own testimony. He testified that immediately after appointing him Interim Executive Chef, Lawson told Burt that "[he] was going to be the potential candidate for the [Executive Chef] position." (Burt Dep. at 164.) When asked whether Burt "understood . . . that [he was] being considered" at the point at which he knew that defendants were looking at a number of candidates, Burt responded "[y]es." (*Id.* at 184.) In addition, Burt testified that although defendants did not interview him for the position, Lawson told him that a formal interview was unnecessary because his "interview [was] what [he did] every day on the job" as Interim Executive Chef. (*Id.* at 183.) According to Burt, Lawson also told him, "You're doing a very good job. . . . [W]e don't need to interview

you." (*Id.*) Indeed, when Lawson was asked whether he told "Burt that he was being considered for the position of [E]xecutive [C]hef," Lawson responded, "Yes, I did." (Lawson Dep. at 37.[3]) Finally, in Lawson's August 19, 2010 email to Burt, he asked Burt to gather ingredients for the taste test and specified that there would "be 3 (*including you*) chefs." (Burt Dep., Ex. 6, at 2 (emphasis added).)

In countering defendants' evidence, Burt relies entirely on Mintz's deposition testimony. (*See* Pl.'s Opp'n at 9–23 (reprinting pages 5–59 of Mintz's deposition transcript).[4]) Mintz testified to her opinion that Lawson had "ruled [Burt] out for the position" (Mintz Dep. at 14), but her testimony does not support this inference. She testified that at a meeting of the Club's Executive Committee when Burt was serving as the Interim Executive Chef, the Club's President asked Lawson his opinion about Burt, and Lawson allegedly responded, "he's just average." (*Id.* at 13.) Mintz also testified that when she "told [Lawson] point-blank that [she] felt he had ruled [Burt] out for the position" and that she felt he "didn't intend to appoint him," Lawson responded that "that wasn't true," and Mintz "told him he was a racist." (*Id.* at 14.) However, Mintz further stated that Lawson "tr[ied] to get Burt to participate" in the application pro-

---

3. Mintz also testified that Lawson told Burt that "his on-the-job-experience was his interview." (Mintz Dep. at 11–12.)

4. Burt has not argued the relevance of Crawford's affidavit, nor does it offer support for his claims. Crawford testified that, in June 2010, Burt told Crawford of "his concern of discrimination and racial harassment" by Lawson when he saw "Lawson interviewing outside candidates for the Executive Chef position." Crawford Aff. at 1 (internal quotation marks omitted). Crawford investigated Burt's concerns. She testified that her "findings were quiet [sic] overwhelming in . . .

Burt's favor," and "yet her affidavit only relates that she found that Burt was doing an exceptional job" as Interim Executive Chef, based on the fact that he had reduced the Club's food costs and had received high marks from members. (*Id.*) Although she testified that she "could find no reason" why Burt "was not offered the [E]xecutive [C]hef position" (*id.*), Crawford neither addressed the taste test nor offered any evidence, other than by vague reference to her "findings of discrimination" (*id.* at 2), that Burt's race played any factor in his not being hired.

cess, including the taste test. (*Id.* at 54–55.)

In light of this latter statement by Mintz, the testimony of Burt and of Lawson, and Lawson's email to Burt, Mintz's testimony does not raise a genuine issue of material fact as to whether defendants considered Burt for the Executive Chef position. Nor does Mintz's opinion that Lawson was a "racist" undercut defendants' argument that Burt did not suffer an adverse employment action. *Cf. Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1290 (11th Cir.2005) (A witness's belief that a defendant "is a racist," even assuming that it "is admissible evidence" and even further "assuming that [the defendant] is a racist[,] . . . would not create a genuine issue of material fact that [defendants] fired [plaintiff] because of racism.") The Court concludes that Mintz's testimony is insufficient for "a reasonable jury" to "return a verdict" for Burt, *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, and that defendants' evidence suffices to show that Burt's candidacy was considered.

Defendants' evidence is also sufficient to support their argument that Burt cannot prevail on his claim because he chose not to complete the application process for the Executive Chef position. Nowhere does Burt contradict defendants' assertion, backed by the deposition testimony of both Lawson and Mintz, that he willingly decided not to participate in the taste test despite being told that doing so was a necessary prerequisite to getting the job.[5] There can be no adverse employment action where a plaintiff, of his own volition and despite being individually encouraged to do so, failed to complete the application process. *See, e.g., Sanchez v. Bland Farms, LLC*, No. 6:08–cv–96, 2011 WL 2457519, at *15 (S.D.Ga. June 16, 2011) ("Defendant's failure to hire workers who did not apply for work is not an adverse employment action." (citing *Jones v. Ala. Power Co.*, 282 Fed.Appx. 780, 785 (11th Cir.2008))); *Murray v. Beverage Distrib. Ctr., Inc.*, 757 F.Supp.2d 480, 489 (D.N.J.2010) (an employer does not take "an adverse employment action" against plaintiff when plaintiff does "not apply for" a position).[6] Burt has admitted that he

**5.** (*See* Lawson Dep. at 33 ("Burt said he was not going to participate" in the taste test "because . . . he felt that he had been doing the job and cooking in that role for several months and that he, therefore, shouldn't need to be competing with other chefs."); *id.* at 39 (Lawson told Burt that the taste test was "the final test" and that if he took himself "out of [it] . . . and refuse[d] to be involved in [it] then [he would be] taking [himself] out of consideration for the position."); *id.* at 40 (affirming that the only reason Burt was not hired as Executive Chef was his refusal to participate in the taste test); Mintz Dep. at 32 (Lawson asked Burt to participate in the taste test, and Burt's "answer was, no, he did not choose to participate."); *id.* at 39 (Burt chose not to participate in the taste test because "he felt that he had no chance of getting the position, and he was not going to participate in something that was meaningless to him.").) Mintz offered conflicting testimony as to whether she knew that the taste test was a

"requirement" of the application process. (*Compare id.* at 37 (acknowledging that the taste test was a requirement of the application process for the Executive Chef position) *with id.* at 41 (affirming that she did not know whether the taste test was a "requirement or a necessary requirement").)

**6.** An "employee's failure to apply for a job is not an inexorable bar" to an employment discrimination lawsuit, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 364, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), but where a nonapplicant alleges discrimination in not being hired he faces "the difficult task," *id.*, of "show[ing] that he was a potential victim of unlawful discrimination" by demonstrating that "he was deterred from applying for the job by the employer's discriminatory practices." *Id.* at 368, 97 S.Ct. 1843. Here, Burt has not put forward any evidence that defendants engaged in discriminatory practices

chose not to participate in the taste test despite Lawson's encouraging him to do so and advising him that it was a necessary component of the application process. (*See* Defs.' SOF ¶¶ 25–26.) Furthermore, Burt has not challenged Lawson's account that he decided against participating "because 'he felt that he had been doing the job and cooking in that role for several months and that he, therefore, shouldn't need to be competing with other chefs.'" (*Id.* ¶ 25 (quoting Lawson Dep. at 33).) Because Burt has not made a showing sufficient to establish that he suffered an adverse employment action with regard to his not being hired as Executive Chef, the Court will grant defendants summary judgment on this claim.[7]

## CONCLUSION

For the reasons stated, the Court will grant defendants' motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

## *MEMORANDUM OPINION*

On December 8, 2011, this Court granted summary judgment to defendants on plaintiff's employment discrimination suit.

Federal Rule of Appellate Procedure 4(a)(1)(A) requires a notice of appeal to be filed within thirty days of entry of judgment. Plaintiff missed the deadline by two days, so he now moves this Court to extend his time to file a notice of appeal. For the reasons set forth below, the Court will grant plaintiff's motion.

## BACKGROUND

This matter arises from plaintiff's employment discrimination suit alleging that defendants discriminated against him on the basis of race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act, D.C.Code § 2–1401 *et seq.* The Court granted defendants' motion for summary judgment on December 8, 2011. *See Burt v. Nat'l Republican Club of Capitol Hill,* No. 10–cv–1911, 828 F.Supp.2d 115, 2011 WL 6097981 (D.D.C. Dec. 8, 2011).[1] Plaintiff's previous counsel sent plaintiff an e-mail on December 12, 2011, relaying the Court's decision, excerpting the Court's opinion, informing plaintiff of the thirty-day filing period, and notifying plaintiff that their representation agreement did

---

that deterred him from completing the application process for the Executive Chef position. Indeed, Burt himself has offered no explanation for why chose not to participate.

**7.** The outcome would be the same were the Court to assume, *arguendo,* that Burt had suffered an adverse employment action, and go on to assess defendants' proffered reason for not selecting him for the Executive Chef position. Defendants claim that Burt's failure to complete the taste test was the only reason that he was not hired as Executive Chef. (Defs.' SOF ¶ 29.) Burt has neither alleged impropriety in defendants' inclusion of the taste test in the hiring process, nor has he put forward evidence that would tend to undermine defendants' asserted non-discriminatory reason for not hiring him. In the alternative, accordingly, defendants' motion for summary judgment is granted as to this claim because

Burt "failed to put forward sufficient evidence for a reasonable jury to find that [defendants] legitimate, non-discriminatory reason was not the actual reason and that [defendants] intentionally discriminated against him on the basis of race." *Brady,* 520 F.3d at 497.

**1.** Both parties contend that judgment in this case was never entered under Federal Rule of Civil Procedure 58. (*See* Pl.'s Mot. at 3; Defs.' Bill of Costs Ex. 1, at 1 n. 1 [Dkt. No. 26].) This contention is erroneous. *See Kidd v. District of Columbia,* 206 F.3d 35, 38–41 (D.C.Cir.2000) (district court order stating "Motion for Summary Judgment ... is GRANTED" constitutes "a judgment under Rule 58"). The December 8, 2011 Order in this case states that "Motion for Summary Judgment ... is GRANTED" and thus beyond any question qualifies as a "judgment" under Rule 58.

not cover "post judgment litigation" and that plaintiff would "need to seek other counsel to advise and/or represent you in your appeal." (Pl.'s Mot. Ex. 1; *see also* Pl.'s Reply at 1 n. 1.) Plaintiff contacted current counsel, Hnin Khaing, via e-mail on January 4, 2012, but due to scheduling conflicts, Khaing could not meet with plaintiff until January 10, and at that time, she agreed to represent him. (Pl.'s Mot. at 2–3.) On January 9, 2012, the period to file a notice of appeal lapsed. *See* Fed. R.App. P. 4(a)(1)(A). On January 11, 2012, plaintiff, through an associate of Khaing's, filed a notice of appeal. (Notice of Appeal [Dkt. No. 24].)

On February 6, 2012, plaintiff timely filed a motion requesting that this Court extend the deadline to file a notice of appeal to January 11, 2012. *See* Fed. R.App. P. 4(a)(5)(A)(i). Plaintiff alleges that the following circumstances amount to both "good cause" and "excusable neglect" justifying the Court's granting of such extension under Rule 4(a)(5): "(1) termination of representation of previous counsel; (2) improper advice by previous counsel; (3) lack of timely knowledge of this Court's entry of summary judgment; (4) lack of sufficient time to seek new counsel; and (5) lack of financial ability to secure new counsel." (Pl.'s Mot. at 1–2.) Plaintiff's motion, defendants' opposition, and plaintiff's reply are now before the Court.

## ANALYSIS

### I. LEGAL STANDARD

 The filing of a timely notice of appeal is both mandatory and jurisdictional. *Moore v. S.C. Labor Bd.*, 100 F.3d 162, 163 (D.C.Cir.1996) (per curiam) (citing *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 264, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978)). Parties must file a notice of appeal within thirty days after judgment or

the order appealed from is entered. Fed. R.App. P. 4(a)(1)(A). However, a district court retains discretion to determine whether plaintiff has shown "excusable neglect" or "good cause" sufficient to warrant the filing of a notice of appeal after the prescribed deadline has passed. *See* Fed. R.App. P. 4(a)(5)(A) ("The district court *may* extend the time to file a notice of appeal ...."); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 n. 5 (D.C.Cir.2001) ("We review [Rule 4(a)(5)] orders on an abuse of discretion standard, *see Johnson v. Lehman*, 679 F.2d 918, 919–20 (D.C.Cir. 1982)[.]").

"The excusable neglect standard applies in situations in which there is fault; in such situations, the need for an extension is usually occasioned by something within the control of the movant." Fed. R.App. P. 4(a)(5)(A)(ii), Advisory Committee Notes to 2002 Amendments. In contrast, the "good cause" standard applies where the motion for extension is "occasioned by something that is not within the control of the movant.... If, for example, the Postal Service fails to deliver a notice of appeal...." *Id.* Because the reasons given for delay were largely within plaintiff's control, the question before the Court is whether plaintiff has demonstrated "excusable neglect" to justify an extension of time to file his notice of appeal.

### II. EXCUSABLE NEGLECT

 The Supreme Court established, in *Pioneer Investment Services, Inc. v. Brunswick Associates, Ltd.*, 507 U.S. 380, 392–94, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), that excusable neglect is an "elastic concept" encompassing "situations in which the failure to comply with a filing deadline is attributable to negli-

gence." [2] A determination of whether neglect is "excusable" is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395, 113 S.Ct. 1489. The relevant factors include: (1) the danger of prejudice to the other party; (2) the length of the delay and potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *See id.* Considering all the relevant facts, the Court finds that plaintiff has shown that his delay in filing a notice of appeal was due to excusable neglect.

Defendants argue that they will be "heavily prejudiced by having to spend the time, effort and expense to oppose this frivolous motion and oppose the appeal if Plaintiff's Motion is ultimately granted...." (Defs.' Opp'n at 6.) This argument is unpersuasive, for if accepted, it would eviscerate the very concept of "excusable" neglect. No neglect would ever be excusable if the prejudice of "having to spend the time, effort and expense" to oppose a motion for extension or to litigate an appeal were dispositive in this context. (*See id.*) Furthermore, courts in this district have determined that the first two *Pioneer Investment Services* factors "are of minimal relevance when applied to Rule 4(a)(5)(A)(ii) considering that a related motion can only be considered when it is brought within 30 days after the Rule 4(a)(1) filing deadline." *Anyanwutaku v. Wilson,* No. 00–cv–2296, 2006 WL 1663407, at *3 (D.D.C. June 12, 2006) (citing *Webster,* 270 F.Supp.2d at 14).

Defendants also point out that plaintiff received written notice from his former counsel that he had thirty days from December 8, 2012, to file a notice of appeal under Rule 4. (*See* Defs.' Opp'n at 1–2; Pl.'s Mot. Ex. 1, at 2; *see also* Pl.'s Reply at 1 n. 1.) Plaintiff was thus on notice, bringing the reason for delay further within his control and weighing against a finding of excusable neglect. *See Pioneer,* 507 U.S. at 395, 113 S.Ct. 1489. Furthermore, courts have declined to find excusable neglect in cases factually similar to this one—albeit with the notable distinction that in those cases, the plaintiffs had a past history of either knowing about or missing filing deadlines. *See Slovinec v. Amer. Univ.,* 552 F.Supp.2d 12, 14 (D.D.C. 2008) (no excusable neglect where *pro se* litigant alleged "pressurized job search" and limited resources as reasons for delay, as litigant's court filings demonstrated thorough knowledge of deadlines); *Anyanwutaku,* 2006 WL 1663407, at *2 (no excusable neglect where plaintiff claimed "emotional disorganization" and other medical reasons caused delay, as plaintiff retained same counsel throughout filing period and had a "nearly unfailing pattern of untimely filing of documents over the course of his litigious history").

The fact that plaintiff had notice of the deadline certainly establishes that he was at fault for the delayed filing, but mere fault does not alone defeat a claim of excusable neglect. *See Pioneer Inv. Servs.,* 507 U.S. at 387, 113 S.Ct. 1489; *see also Webster,* 270 F.Supp.2d at 14 (*Pioneer* holds that "fault on the part of a late filer does not extinguish a claim of excusable neglect"). In fact, courts have found ex-

**2.** "Although *Pioneer* interpreted excusable neglect in the context of a bankruptcy rule, every circuit court that has considered the question has extended *Pioneer* to determinations of excusable neglect under Rule 4.... While not explicitly extending *Pioneer* to such determinations, this Circuit has cited *Pioneer* in reviewing motions for extensions of time to file a notice of appeal." *Webster v. Pacesetter, Inc.,* 270 F.Supp.2d 9, 12 n. 6 (D.D.C.2003) (citations omitted); *see also Marx v. Loral Corp.,* 87 F.3d 1049, 1054 (9th Cir.1996).

cusable neglect where, as here, plaintiff's counsel abruptly withdrew and plaintiff was left without representation for the pendency of the Rule 4 filing period. *See Griffin v. George B. Buck Consulting Actuaries, Inc.*, 573 F.Supp. 1134, 1135 (S.D.N.Y.1983); *Ecoban Capital Ltd. v. Ratkowsky*, No. 88–cv–5848, 1990 WL 3929 (S.D.N.Y. Jan.16, 1990).

In *Griffin*, the court entered judgment, plaintiff's attorney withdrew, the Rule 4 filing period lapsed, and plaintiff filed a *pro se* late notice of appeal. 573 F.Supp. at 1134–35. The court, treating plaintiff's notice as a motion for extension of time, held:

> [T]he withdrawal of Griffin's attorney following entry of judgment and Griffin's unfamiliarity with appellate procedure provide good cause to permit an extension of time for filing the notice of appeal, and ... the strong policy favoring disposition of legal claims on their merits justifies the resolution of any doubts on the subject in favor of permitting the appeal.

*Griffin*, 573 F.Supp. at 1135. While the court in *Griffin* cited "good cause" as the reason for its decision, its reasoning more accurately supports a finding of "excusable neglect," since plaintiff had control over the reason for delay—his own unfamiliarity with appellate procedure. *See* Fed.

R.App. P. 4(a)(5)(A)(ii), Advisory Committee Notes to 2002 Amendments.

In *Griffin*, as in this case, original counsel for plaintiff withdrew soon after the case was dismissed; but in *Griffin*, plaintiff filed his untimely notice of appeal *pro se* and never hired new lawyers after original counsel withdrew. *See* 573 F.Supp. at 1135. Plaintiff here was effectively a *pro se* litigant from the time his counsel withdrew on December 8, 2011, until Khaing's acceptance[3] of his case on January 10, 2012—one day after the filing deadline. (*See* Pl.'s Mot. at 2–3; Defs.' Opp'n at 2–3.) This factual difference between the cases would have been relevant had plaintiff retained Khaing prior to the filing deadline and Khaing had then negligently failed to file a timely notice of appeal. *See Webster*, 270 F.Supp.2d at 14 (attorney error does not constitute "excusable neglect" for purposes of Rule 4(a)(5)(A)(ii)). But that is not what happened here.[4]

Plaintiff should not be denied the protections afforded to *pro se* litigants because he eventually filed his untimely notice of appeal through counsel. He was effectively a *pro se* litigant for almost the entirety of the thirty-day filing period, subject during that period to the same handicap—unfamiliarity with appellate procedure following withdrawal of original

---

**3.** The fact that plaintiff contacted Khaing on January 4, but that Khaing's professional obligations prevented them from scheduling an initial consultation until January 10 (Pl.'s Mot. at 2–3; Defs. Opp'n at 2) does not counsel against a finding of excusable neglect. Attempts to contact counsel before the running of the deadline would, if anything, indicate good faith by plaintiff. Though a movant's good faith does not always support a finding of excusable neglect, it is one of the four *Pioneer Investment Services* factors that favor extending the filing deadline.

**4.** That Khaing erroneously believed judgment had not been entered and that the Rule 4

filing deadline had therefore not lapsed is of no moment—Khaing's involvement in the case only began the night of January 10, one day after the filing period had run. (*See* Pl.'s Mot. at 3.) The notice of appeal was filed the next morning, which was, in the Court's determination, as soon as practicably possible. (*See id.*) Moreover, Khaing's inability to accept plaintiff's case until six days after he initially called her is not the kind of inexcusable attorney error contemplated by the case law. *See, e.g., Webster*, 270 F.Supp.2d at 14 (delay caused by attorney misinterpretation of legal rules is not excusable).

counsel—that the *Griffin* court found sufficient to excuse neglect. While plaintiff in this case, unlike plaintiff in *Griffin,* technically had notice of the thirty-day filing deadline, plaintiff's confusion engendered by former counsel's statement that the "case is now over" (Pl.'s Mot. Ex. 1, at 2; *see also* Pl.'s Mot. at 2) is understandable in light plaintiff's lack of legal sophistication and the sudden absence of counsel who could have explained the appellate process and the significance of the filing deadline.

*Ecoban Capital* was another case involving termination of a relationship with previous counsel following entry of summary judgment. 1990 WL 3929, at *1. There, "[d]espite their efforts, [movants] were unable to obtain new counsel until after the time to appeal permitted under Rule 4(a)(1) had expired," and only filed their notice of appeal once they had obtained new counsel and after the thirty-day period had lapsed. *Id.,* at *2. *Ecoban Capital* distinguished "administrative failure by the appellant's attorney" from situations in which the moving party is "abruptly left without legal representation shortly after judgment was entered against them" in holding that the filing delay was caused by plaintiff's excusable neglect. *Id.,* at *2. In finding excusable neglect, the court noted that the moving party's inability to find counsel was "exacerbated by the number of defendant-investors involved in these proceedings, the fact that they are geographically spread across the country, and, most significantly, by the complexity of the numerous proceedings in question to which most are parties." *Id.* Plaintiff's inability to find counsel here was likewise exacerbated by his limited personal understanding of the significance of the judgment against him, his modest financial means, and the difficulty of finding an attorney on short notice during the holiday season. Although any one of these listed exacer-

bating factors might alone be insufficient to find excusable neglect, they are, when considered in the aggregate, enough to tip the balance in plaintiff's favor.

## CONCLUSION

Because this Court finds that plaintiff's has shown excusable neglect, plaintiff's motion *nunc pro tunc* for extension of time to file notice of appeal is granted, and the Court will treat plaintiff's January 11, 2012 notice of appeal as having been timely filed.